UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

CITIZENS AGAINST CASINO GAMBLING IN ERIE
COUNTY, REV. G. STANFORD BRATTON, D. MIN.,
EXECUTIVE DIRECTOR OF THE NETWORK OF
RELIGIOUS COMMUNITIES, NATIONAL COALITION
AGAINST GAMBLING EXPANSION, PRESERVATION
COALITION OF ERIE COUNTY, INC., COALITION
AGAINST CASINO GAMBLING IN NEW YORK—
ACTION, INC., THE CAMPAIGN FOR BUFFALO—
HISTORY ARCHITECTURE AND CULTURE,
ASSEMBLYMAN SAM HOYT, MARIA WHYTE, JOHN
MCKENDRY, SHELLY MCKENDRY, DOMINIC J.
CARBONE, GEOFFREY D. BUTLER, ELIZABETH F.
BARRETT, JULIE CLEARLY, ERIN C. DAVISON,
ALICE E. PATTON, and MAUREEN C. SCHAEFFER,

                    Plaintiffs,

and

COUNTY OF ERIE and JOEL A. GIAMBRA,

                    Intervenor-Plaintiffs,

          v.

DIRK KEMPTHORNE,[1] in his Official Capacity as the
Secretary of the Interior, JAMES CASON, in his Official
Capacity as the Acting Assistant Secretary of the Interior
for Indian Affairs, UNITED STATES DEPARTMENT OF
THE INTERIOR, PHILIP N. HOGEN, in his Capacity as
Chairman of the National Indian Gaming Commission, and
NATIONAL INDIAN GAMING COMMISSION,

                    Defendants.

**DECISION AND ORDER**

06-CV-0001S

---

[1] Former Secretary of the Interior, Gale A. Norton, was the first named defendant when this action was filed. Dirk Kempthorne, who replaced Norton as Secretary following his confirmation by the Senate on May 26, 2006, was later substituted. Because Norton was the Secretary during the time period relevant to Plaintiffs' claims, all discussions relating to the Secretary will continue to refer to Norton and will use the pronoun "her."

TABLE OF CONTENTS

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

II.   BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

      A.    Legal Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

            1.    The Relevant Provisions of the IGRA . . . . . . . . . . . . . . . . . . . . . .  5

                  a.    Indian Lands . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

                  b.    Tribal-State Gaming Compacts . . . . . . . . . . . . . . . . . . . . . .  7

                  c.    Tribal Gaming Ordinances . . . . . . . . . . . . . . . . . . . . . . . . .  8

            2.    The Seneca Nation Settlement Act of 1990 . . . . . . . . . . . . . . . .  9

      B.    Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

            1.    The SNI's Tribal-State Compact . . . . . . . . . . . . . . . . . . . . . . . . .  11

            2.    The SNI's Class III Gaming Ordinance . . . . . . . . . . . . . . . . . . . .  14

            3.    The SNI's Land Acquisitions . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

      C.    The Lawsuit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

III.  DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

      A.    SNI's Motion for Leave to File an *Amicus* Brief . . . . . . . . . . . . . . . . . . .  18

            1.    Standard for Consideration of *Amicus Curiae* Participation . . . .  18

            2.    The Propriety of SNI's Proposed Submission . . . . . . . . . . . . . .  19

            3.    The Analytical Framework . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

            4.    The Necessary Party Determination . . . . . . . . . . . . . . . . . . . . . .  23

B.    Subject Matter Jurisdiction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

C.    APA Review  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34

　　　1.    Standard of Review  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35

　　　2.    Review of Final Agency Action under the IGRA . . . . . . . . . . . . .  36

D.    The NIGC's Approval of the SNI's Tribal Gaming Ordinance  . . . . . . . .  38

E.    The Remaining Claims and Motions  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  48

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  49

V.    ORDERS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  50

## ABBREVIATIONS AND ACRONYMS

The following abbreviations and acronyms are used in this decision:

**STATUTES**

APA           Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*

IGRA          Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701 *et seq.*

NEPA          National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*

NHPA          National Historic Preservation Act, 16 U.S.C. §§ 470 *et seq.*

SNSA          Seneca Nation Settlement Act of 1990, 25 U.S.C. §§ 1774 *et seq.*

QTA           Quiet Title Act, 28 U.S.C. § 2409a

**AGENCIES AND ENTITIES**

Chairman      Chairman of the National Indian Gaming Commission

NIGC          National Indian Gaming Commission

Secretary     Secretary of the United States Department of the Interior

SEGC          Seneca Erie Gaming Corporation

SNI           Seneca Nation of Indians

**DOCUMENTS**

Compact       "Nation-State Gaming Compact between the Seneca Nation of Indians and the State of New York," deemed approved by the Secretary as of October 25, 2002

Ordinance     "Seneca Nation of Indians Class III Gaming Ordinance of 2002 as Amended," approved by the Chairman on November 26, 2002

iv

## I.  INTRODUCTION

On January 3, 2006, Plaintiffs Citizens against Casino Gambling in Erie County, *et al.*, commenced this action for declaratory and injunctive relief under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706; the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701 *et seq.*; the National Environmental Policy Act ("NEPA"), as amended, 42 U.S.C. §§ 4321 *et seq.*; and the National Historic Preservation Act ("NHPA"), as amended, 16 U.S.C. §§ 470 *et seq.*  Plaintiffs allege that former Secretary of the Interior Gale A. Norton; Acting Assistant Secretary of the Interior for Indian Affairs James Cason; the United States Department of the Interior; Chairman of the National Indian Gaming Commission Philip N. Hogen; and the National Indian Gaming Commission ("NIGC") (collectively, "Defendants" or "the Government") violated the laws of the United States when, by their decisions and actions, they permitted the Seneca Nation of Indians ("SNI") to construct a gambling casino on land it purchased in the City of Buffalo with funds appropriated pursuant to the Seneca Nation Settlement Act of 1990 ("SNSA").

There are four motions presently before this Court.  First is the Government's Motion to Dismiss the Complaint in its entirety for lack of subject matter jurisdiction and failure to state a claim, filed on April 26, 2006.[2]  (Docket No. 22.)  On July 25, 2006, Plaintiffs filed a joint Motion for Summary Judgment as to all claims.  (Docket No. 39.)  On

---

[2] Approximately one week after the Government filed its motion, the County of Erie and County Executive Joel A. Giambra moved to intervene in this action pursuant to Federal Rule of Civil Procedure 24(a)(2) or 24(b)(2).  The unopposed motion was granted and an Intervenor Complaint was filed on June 6, 2006.  The claims for relief in the Intervenor Complaint, ¶¶ 63-101 are identical to the claims for relief in the original Complaint, ¶¶ 49-86 (except for the Intervenor-Plaintiffs' addition of its allegation at ¶ 94 relating to anticipated lost sales tax revenue and increased taxpayer expenditures relating to criminal activity).  Therefore, this Decision will refer to these pleadings, collectively, as "the Complaint," and determinations on Defendants' Motion to Dismiss will be applicable to both the Plaintiffs and Intervenor-Plaintiffs (collectively, "Plaintiffs").

August 8, 2006, the SNI moved for leave to file an *amicus* brief seeking dismissal of the Complaint in its entirety pursuant to Rule 19 of the Federal Rules of Civil Procedure. (Docket No. 44.)   Each of these motions has been fully briefed, was the subject of extensive oral argument on November 1, 2006, and is now pending for disposition.   In addition, the Government moved to strike Plaintiffs' exhibits and portions of their Memorandum of Law in Support of Summary Judgment.  (Docket No. 54.)  The Motion to Strike was taken under advisement without oral argument.

As discussed more fully below, this Court will grant the SNI's motion for leave to file an *amicus* brief.  However, after fully considering the SNI's position and the arguments set forth in its brief, this Court finds that neither the SNI nor the State of New York is a necessary and indispensable party to this action such that dismissal of the case is required under Rule 19 of the Federal Rules of Civil Procedure.  Specifically, this Court finds that the SNI's interest in operating a gambling casino in the City of Buffalo is adequately represented by the Defendants in this action, who are vigorously defending their decisions to permit that very activity.  Furthermore, the State does not have an interest in the subject matter of this litigation that will be impaired by a judgment in Plaintiffs' favor.

Defendants have moved to dismiss this action in its entirety on the grounds that: 1) the Quiet Title Act applies to this case and the Defendants are therefore immune from suit, 2) the Secretary of the Interior's ("the Secretary") "Indian lands" opinion is not a reviewable final agency action under the APA and therefore the Court lacks jurisdiction to consider Plaintiffs' claims, 3) the NIGC Chairman is not required to make an Indian lands

determination and he fully carried out his statutory duties, and 4) Plaintiffs otherwise fail to state any claim against any Defendant.

This Court finds that Plaintiffs are not challenging the SNI's title to real property it purchased in the City of Buffalo and therefore rejects Defendants' argument that the Quiet Title Act renders Defendants immune from suit.  However, this Court does agree with Defendants that the Secretary's "Indian lands" opinion was not a final agency action and, further, that no final agency action has occurred with respect to that determination.  As such, the Secretary's  opinion and related statutory interpretations are not yet reviewable under the APA, and this Court is without jurisdiction to review the IGRA claims against the Secretary.  Accordingly, this Court will grant Defendants' motion to dismiss claims One and Two against the Secretary for lack of subject matter jurisdiction.

Having fully considered the purpose and structure of the IGRA, and the authority delegated to the NIGC by Congress, this Court rejects Defendants' contention that the NIGC Chairman is not required to make "Indian lands" determinations when he acts on a tribal gaming ordinance.  To the contrary, whether Indian gaming will occur on Indian lands is a threshold jurisdictional question that the NIGC must address on ordinance review to establish that: 1) gaming is permitted on the land in question under the IGRA, and 2) the NIGC will have regulatory and enforcement power over the gaming activities occurring on that land.  In this case, both the general location in which the SNI intended to purchase land and the manner in which it intended to acquire and hold that land were made known to the NIGC Chairman in 2002.  However, there is no indication in the record that he considered that information or made any Indian lands determination when he affirmatively

3

approved the SNI's class III gaming ordinance in 2002.  Therefore, this Court will deny Defendants' motion to dismiss the IGRA claims against the NIGC.

As a result of this Court's conclusion that the NIGC failed to consider this threshold jurisdictional issue, this Court can not find that the NIGC's approval of a tribal gaming ordinance permitting the SNI to conduct gambling on newly acquired land in the City of Buffalo was the result of reasoned decision-making.  Because the Indian lands determination is one that Congress placed in the NIGC's hands, the NIGC's 2002 ordinance approval is vacated as arbitrary and capricious insofar as it permits gaming on land to be acquired thereafter in the City of Buffalo.  The SNI's ordinance will be remanded to the NIGC for an Indian lands determination with respect to the Buffalo Parcel.

As explained more fully below, the remand to the NIGC moots Plaintiffs' remaining claims and, consequently, Plaintiffs' Motion for Summary Judgment, Defendants' Motion to Strike and the remainder of Defendants' Motion to Dismiss are also rendered moot.

## II.  BACKGROUND

This Court is asked to review the reasonableness of agency action, including decisions involving statutory interpretation of both the IGRA and the SNSA.  Therefore, a recitation of the legal and factual background of this case is helpful in understanding the issues presented in the pending dispositive motions, particularly with respect to certain statutory terms such as "Indian lands," "restricted fee," "governmental power," "tribal-state compact," "gaming ordinance," and "land claim."  Some of these same terms also are central to consideration of the SNI's motion for leave to file an *amicus* brief.

4

A.   **Legal Background**

1.   <u>**The Relevant Provisions of the IGRA**</u>

Congress enacted the IGRA in 1988 to establish a comprehensive statutory scheme governing gambling on Indian lands.   25 U.S.C. §§ 2701-2721.   The IGRA "seeks to balance the competing sovereign interests of the federal government, state governments and Indian tribes, by giving each a role in the regulatory scheme."   <u>Artichoke Joe's v. Norton</u>, 216 F. Supp. 2d 1084, 1092 (E.D. Cal. 2002), *aff'd*, 353 F.3d 712 (9th Cir. 2003), *cert. denied*, 543 U.S. 815, 125 S. Ct. 51, 160 L. Ed. 2d 20 (2004).

The IGRA provides for three classes of gaming, each of which is subject to a different level of regulation.   25 U.S.C. § 2710.   Class I gaming is not subject to any type of regulation and includes "social games solely for prizes of minimal value or traditional forms of Indian gaming [associated] with tribal ceremonies or celebrations."   *Id*. § 2703(6), 2710(a)(1) (alteration added).

Class II gaming includes bingo, pull-tabs, punch boards and other similar games, as well as card games not prohibited by state law.   *Id*. § 2703(7)(A).   Class II games are authorized if conducted under a gaming ordinance approved by the NIGC Chairman and located in a state that permits such gaming for any purpose by any entity. *Id*. § 2710(a)(2), (b)(1)(A) and (B).   The Federal government regulates, monitors and audits class II gaming. *Id.* § 2706.

Class III gaming, the category at issue in this case, is the "most heavily regulated and most controversial form of gambling" under the IGRA.   <u>Artichoke Joe's Cal. Grand Casino v. Norton</u>, 353 F.3d 712, 715 (9th Cir. 2003).   It is comprised of all forms of gaming

not in classes I or II, including slot machines, games such as baccarat, blackjack, roulette, and craps, and sport betting, parimutuel wagering and lotteries. *Id.* § 2703(8) and (7)(B); 25 C.F.R. § 502.4. Class III gaming is lawful only if: (1) the governing body of the tribe having jurisdiction over the "Indian land" on which gaming is to take place authorizes class III gaming by adopting an "ordinance" or resolution that is then approved by the NIGC Chairman; (2) the gaming is located in a state that permits such gaming; and (3) the gaming is conducted in conformance with a "tribal-state compact" that regulates such gaming. *Id.* § 2710(d)(1).

### a.    Indian Lands

The consistent and overarching requirement common to each class of gaming is that it be sited on Indian land within the tribe's jurisdiction. *Id.* § 2710(a)(1), (b)(1), (d)(1)(A)(i) and (d)(2)(A). For purposes of the IGRA, "Indian lands" include:

> (A) all lands within the limit of any Indian reservation; and
>
> (B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or *held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power*.

*Id*. § 2703(4) (emphasis supplied). The land in the City of Buffalo at issue in this case was purchased by the SNI in 2005 and is held in "restricted fee"—*i.e.*, it is subject to restriction by the United States against alienation. The parties disagree as to whether the SNI can exercise governmental power over that land.

6

Another IGRA provision at issue here, § 2719, expressly prohibits gaming on land "acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988" unless a defined statutory exception applies.[3]  Included among the exceptions are when:

> (A) the Secretary, after consultation with the Indian tribe and appropriate State, and local officials, including officials of other nearby Indian tribes, determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination; or
>
> (B) *lands are taken into trust as part of—*
>
> (i) *a settlement of a land claim,*

*Id.* § 2719(b)(1) (emphasis supplied).  The applicability of the "settlement of a land claim" exception to land acquired in Buffalo after October 17, 1988, is in dispute here.

### b.    Tribal-State Gaming Compacts

An Indian tribe wishing to conduct class III gaming must first request that the state in which its lands are located engage in negotiations for a tribal-state compact to govern the conduct of gaming activities.  *Id.* § 2710(d)(3)(A).  Compacts may include provisions relating to regulatory and jurisdictional issues, state assessments on gaming activities, taxation by the Indian tribe, other subjects relating to the operation of gaming activities, and remedies for breach of contract.  *Id.* § 2710(d)(3)(C).

If an agreement is reached, the compact is submitted to the Secretary of the Interior, who may approve, disapprove or take no action on it.  *Id.* § 2710(d)(8).  "If the Secretary does not approve or disapprove a compact [within] 45 days after the date on which the

---

[3]  This provision is often referred to as the "after-acquired lands prohibition on gaming."

compact is submitted to the Secretary for approval, the compact shall be considered to have been approved by the Secretary, but only to the extent the compact is consistent with [the IGRA]." *Id*. § 2710(d)(8)(C).

Consistent with the foregoing provision, the Secretary is permitted to disapprove a compact only if it violates IGRA, any other provision of federal law, or the United States' trust obligations to Indians. *Id*. § 2710(d)(8)(B). A compact that is either affirmatively approved or considered approved by virtue of the Secretary's non-action takes effect when notice of the approval is published in the Federal Register. *Id*. § 2710(d)(3)(B).

### c.    Tribal Gaming Ordinances

An Indian tribe wishing to conduct class III gaming must also, through its governing body, adopt an ordinance or resolution authorizing class III gaming. That ordinance or resolution must be submitted to the NIGC Chairman along with, among other things, a copy of the tribal-state compact for class III gaming. *Id*. § 2710(2)(A); 25 C.F.R. § 522.2. The Chairman is required, no later than 90 days after the ordinance or resolution is submitted, to approve a submission that: 1) proposes class III gaming on Indian lands of the Indian tribe, and 2) meets the articulated statutory requirements, unless the Chairman determines that the ordinance was not adopted in compliance with the tribe's governing documents, or that the tribal governing body was significantly and unduly influenced in its adoption. 25 U.S.C. § 2710(d)(2)(B) and (e). Thereafter, Class III gaming activity may commence upon publication of the ordinance or resolution and the Chairman's order of approval in the Federal Register, in conformance with the terms of a tribal-state compact that has been approved by the Secretary. *Id*. § 2710(d)(1)(C), (2)(B) and (C).

If the Chairman does not act on an ordinance or resolution within 90 days after its submission, it "shall be considered to have been approved by the Chairman, but only to the extent [it] is consistent with [the IGRA]."  *Id.* § 2710(e).

### 2.    The Seneca Nation Settlement Act of 1990

For more than a century prior to the SNSA's enactment, the SNI leased land on its Allegany Reservation[4] to non-Indians. 25 U.S.C. § 1774(a)(2)(A) and (B).  The leases were primarily concentrated in the City of Salamanca and the nearby villages of Carrollton, Great Valley and Vandalia.  *Id.* §§ 1774(a)(1) and 1774a(10).  The bulk of the leases, first confirmed or authorized by Congress in 1875 (18 Stat. 330), were for a term of ninety-nine years that was set to expire on February 19, 1991. *Id.* §§ 1774(a)(2)(C) and (4).  Over the years, the leases strained relations between the Indian and non-Indian communities. *Id.* § 1774(a)(1).

One of the SNSA's primary purposes was to facilitate the SNI's negotiated extension of the existing land leases with its non-Indian tenants.  25 U.S.C. §§ 1774(b)(1) and (3). Although the SNI had no legal claims pending at the time of the SNSA's enactment, it had filed a claim over the value of its leases in 1952 that eventually was settled in 1977. *Id.* §§ 1774(a)(E), (b)(8).  In light of the impending lease expiration date, Congress undertook an analysis of historic land values and found that payments made to the SNI under the original lease agreement and also in the 1977 settlement "were well below the actual lease value of the property." *Id.* § 1774(a)(3).

---

[4]  The SNI has three reservation areas in New York State, Allegany, Cattaraugus and Oil Spring. 25 U.S.C. § 1774a(7).

By enacting the SNSA, Congress sought to assist in resolving the past inequities to the SNI, to provide stability and security to the non-Indian lessees, to promote economic growth and community development for both the SNI and the non-Indian communities established on reservation land, and to avoid the potential legal liability on the part of the United States that could result if a settlement was not reached.[5] *Id.* §§ 1774(b)(2) and (4)-(8).

In exchange for relinquishing all potential legal claims for lease payments through February 19, 1991, the SNI received, among other things, a payment from the Secretary of the Interior of $30,000,000.  *Id.* §§ 1774b(b) and 1774d(b)(1).  The SNSA permits the SNI to use those funds to acquire land that is "within its aboriginal area in the State [of New York] or situated within or near proximity to former reservation land."  *Id.* § 1774f(c) (alternation added).  Under the SNSA, the State and local governments are to be notified of such an acquisition and are afforded 30 days in which to submit comments to the Secretary on the impact of the removal of the land from real property tax rolls.  *Id.*

> Unless the Secretary determines within 30 days after the comment period that such lands should not be subject to the provisions of section 2116 of the Revised Statutes (25 U.S.C. 177), such lands shall be subject to the provisions of that Act and shall be held in restricted fee status by the Seneca Nation.  Based on the proximity of the land acquired to the Seneca Nation's reservations, land acquired may become a part of and expand the boundaries of the Allegany Reservation, the Cattaraugus Reservation, or the Oil Spring Reservation in accordance with the procedures established by the Secretary for this purpose.

---

[5]  Though not expressly articulated in the SNSA, the potential liability of concern to the United States presumably involved a possible violation of its trust obligation to the SNI by authorizing contractual agreements and/or a settlement for significantly less than fair market value.

*Id.* Once the land attains restricted fee status, it cannot be sold, leased or otherwise conveyed by the SNI without the approval of the federal government.  25 U.S.C. § 177.

## B.    Factual Background

The facts set forth below are either undisputed or drawn from the administrative records.[6]  Any controverted allegations in the Complaint that must be accepted as true for purposes of Defendants' Motion to Dismiss will be discussed further herein, as necessary.

### 1.    The SNI's Tribal-State Compact

On August 18, 2002, the SNI and the State of New York ("the State") executed a tribal-state compact[7] ("the Compact") for the conduct of class III gaming activities.  (Docket No. 1 (Complaint) ¶ 27; Docket Nos. 27-16 (the Compact); 25-2 at 1; 39-9 ¶¶ 10, 15; 53-2 ¶¶ 10, 15.)  The Compact authorizes the SNI to establish three Gaming Facilities: 1) at a selected site in the City of Niagara Falls, 2) at a location to be determined in the City of Buffalo or elsewhere in Erie County, and 3) on current SNI reservation territory.  (Complaint ¶¶ 28-29; Compact ¶ 11.)  The Compact reflects the parties' understanding that both the Niagara Falls and Buffalo sites would be purchased with SNSA funds.  (Compact ¶ 11(b)(2) and (3).)  In anticipation of the use of SNSA funds, the State agreed to support the SNI in its efforts to obtain restricted fee status for both sites.  *Id.* ¶ 11(b)(3).

---

[6]  On April 4, 2006, the NIGC filed a Certified Copy of the Administrative Record relating to its November 26, 2002 approval of the SNIs' Class III Gaming Ordinance of 2002, as amended.  (Docket No. 17.)  On May 2, 2006, the Department of Interior filed its Administrative Record relating to the placement of land in the City of Buffalo in restricted fee status pursuant to the SNSA and its determination regarding the tribal-state gaming compact between the SNI and the State of New York.  (Docket Nos. 25-27.)

[7]  The full title of the executed compact is "Nation-State Gaming Compact between the Seneca Nation of Indians and the State of New York."

11

In addition to circumscribing the geographic sites for gaming and identifying the manner in which new land for gaming will be acquired, the Compact grants the SNI total exclusivity to operate gaming devices within a 10,500 square mile area in western New York State.  *Id.* ¶ 12(a); Docket No. 25-2 at 1.

The executed Compact was forwarded to the Department of the Interior and received on September 10, 2002.  Within 45 days thereafter, the Secretary did not affirmatively approve or disapprove the Compact, thereby allowing it to be deemed approved as of October 25, 2002, pursuant to Section 11(d)(8)(C) of the IGRA, 25 U.S.C. § 2710(d)(8)(C).  (Complaint ¶¶ 27, 30; Docket Nos. 39-9 ¶ 16; 53-2 ¶ 16.)

In letters to the SNI President and the Governor of New York, dated November 12, 2002, then-Secretary Norton explained her decision not to affirmatively act on the Compact, but to allow it to go into effect by operation of law. (Docket No. 25-2.)  Excerpted below are several of the Secretary's observations and determinations:

- Under IGRA the Department must determine whether the Compact violates IGRA, any other provision of Federal law . . . or the trust obligations of the United States to Indians.  *Id*. at 1.

- I have decided to allow this Compact to take effect without Secretarial action.  In enacting IGRA, Congress provided limited reasons for Secretarial . . . disapproval.  [I have] important policy concerns regarding the Compact . . . that fall outside of the limited reasons in IGRA for Secretarial disapproval.  *Id*. at 1-2.

- The choice to specifically deny other tribes gaming opportunities [by granting the SNI geographic exclusivity] is the primary reason I have chosen not to affirmatively approve this Compact.  *Id*. at 4 (alteration added).

12

- <u>Lands Acquired through the Seneca Nation Settlement Act</u>
  I have concluded that this Compact appropriately permits gaming on the subject lands because Congress has expressly provided for the Nation to acquire certain lands pursuant to the Settlement Act. *Id.* at 2.

  [I]t is our opinion that the two cities of Niagara Falls and Buffalo are "situated within or near proximity to" the Nation's former Buffalo Creek and Tonawanda reservations for purposes of the Settlement Act. *Id.* at 6.

  This decision rests squarely on a Congressionally-approved settlement of a land claim. *Id.*

- <u>Indian Lands under IGRA</u>
  IGRA permits a tribe to conduct gaming activities on Indian lands if the tribe has jurisdiction over those lands, and only if the tribe uses that jurisdiction to exercise governmental power over the lands. There is no question that the Settlement Act requires the parcels to be placed in "restricted fee" status. As such, these parcels will come within the definition of "Indian lands" in IGRA if the Nation exercises governmental power over them. The Department assumes that the Nation will exercise governmental powers over these lands when they are acquired in restricted fee. It is our opinion that the Nation will have jurisdiction over these parcels because they meet the definition of "Indian country" under 18 U.S.C. § 1151. Historically, Indian country is land that, generally speaking, is subject to the primary jurisdiction of the Federal Government and the tribe inhabiting it. As interpreted by the courts, Indian country includes lands which have been set aside by the Federal Government for the use of Indians and subject to federal superintendence. In this regard, it is clear that lands placed in restricted status under the Settlement Act are set aside for the use of the Nation, and that such restricted status contemplated federal superintendence over these lands. Finally, the Settlement Act authorizes lands held in restricted status to expand the Nations' [sic] reservation boundaries, or become part of the Nation's reservation. Accordingly, we believe that the Settlement Act contemplates that lands placed in restricted status be held in the same legal manner as existing Nation's lands are held and thus, subject to the Nation's jurisdiction. *Id.*

- <u>Application of Section 20 of IGRA</u>
  Section 20 of IGRA, 25 U.S.C. § 2719[,] contains a general prohibition on gaming on lands acquired in trust by the Secretary for the benefit

13

of an Indian tribe after October 17, 1988, unless one of several statutory exceptions is applicable to the land. [T]he Nation plans to use the provisions of the Settlement Act to acquire the land in restricted fee, rather than in trust. . . . I believe that lands held in restricted fee status pursuant to an Act of Congress such as is presented within this Compact must be subject to the requirements of Section 20 of IGRA. *Id.* at 6-7.

The legislative history to the Settlement Act makes clear that one of its purposes was to settle some of the Nation's land claim issues. Thus, the Nation's parcels to be acquired pursuant to the Compact and the Settlement Act will be exempt from the prohibition on gaming contained in Section 20 because they are lands acquired as part of the settlement of a land claim, and thus fall within the exception in 25 U.S.C. § 2719(b)(1)(B)(i). *Id.* at 7.

In sum, the then-Secretary acknowledged an affirmative duty to determine whether a compact should be disapproved and decided that there was no basis for disapproval in this case.  She further concluded that gaming could take place at sites in Niagara Falls and Buffalo purchased after October 17, 1988 with SNSA funds because the lands would be acquired as part of the settlement of a land claim, and would be held in restricted fee and subject to the SNI's jurisdiction and governmental authority, thereby meeting the IGRA definition of Indian lands.

On December 9, 2002, the Department of the Interior published a notice in the Federal Register stating that the Compact "is considered approved, but only to the extent the compact is consistent with the provisions of IGRA."  67 Fed. Reg. 72,968.

## 2.    The SNI's Class III Gaming Ordinance

On August 29, 2002, the SNI submitted a Class III Gaming Ordinance and related material, including the Compact, to the NIGC. (Docket No. 17-1, -2 and -10.)  This was prior to the SNI's submission of the Compact to the Secretary.

14

Early in November 2002, the NIGC informed the SNI of certain technical deficiencies in its submission package that required amendment.  (Docket No. 17-5.)  As a result, the SNI submitted a "Class III Gaming Ordinance of 2002 as Amended" ("Ordinance") on November 25, 2002, which the NICG Chairman affirmatively approved on November 26, 2002.  (*Id.* and Docket No. 17-10.)  This was one day after the (amended) Ordinance's submission and within 90 days of submission of the original ordinance.  The NIGC Chairman's letter to the SNI President confirming his approval advised that "the gaming ordinance is approved for gaming only on Indian lands, as defined in the IGRA, over which the Nation has jurisdiction."  (Docket No. 17-10.)

### 3.   The SNI's Land Acquisitions

The SNI purchased the Niagara Falls site identified in the Compact on or about October 25, 2002, the same date the Compact was deemed approved by the Secretary. (Complaint ¶ 34.)  Therefore, that site was owned by the SNI prior to the Chairman's approval of the Ordinance.

Almost three years after the Ordinance approval, on October 3, 2005, the Tribal Council of the SNI designated a Buffalo Footprint, "bounded to the North by Perry Street, to the East by Chicago Street, to the South by Ohio Street, and to the West by Main Street," as the site for its Buffalo gaming facility.  (Docket No. 25-4.)  At about the same time, "the Seneca Erie Gaming Corporation ("SEGC"), a tribally chartered corporation formed for the purposes of developing, financing and operating the Nation's Class III Gaming Facility to be established on Nation territory in Erie County," purchased certain parcels of land within the Buffalo Footprint.  *Id.*; *see also*, Docket Nos. 39-9 ¶ 24; 53-2 ¶

24.  The SEGC conveyed those parcels (hereinafter, "the Buffalo Parcel") to the SNI on October 3, 2005.  (Docket No. 25-7.)

By letters dated October 3, 2005, the SNI notified the State of New York, County of Erie and City of Buffalo that it had acquired the Buffalo Parcel and advised them of the 30-day comment period available under the SNSA.  (Docket Nos. 25-13, -14 and -15.) Following the 30-day comment period, on November 7, 2005, the SNI sent to the Department of the Interior documents supporting its request that the Buffalo Parcel be placed in restricted fee status. (Docket No. 26.)  The Secretary did not determine within 30 days after the comment period that the Buffalo Parcel "should not be subject to the provisions of section 2116 of the Revised Statutes (25 U.S.C. 177)."  Thus, the Buffalo Parcel assumed restricted fee status by operation of law under the SNSA.  (Docket Nos. 39-9 ¶ 30; 53-2 ¶ 30.)

C.    **The Lawsuit**

Plaintiffs commenced this action on January 3, 2006, and were joined by Intervenor-Plaintiffs on June 2, 2006.   As previously noted, the Plaintiffs and Intervenor-Plaintiffs make identical claims which are set forth in four counts in their respective complaints. They take issue with agency statutory interpretation and decision-making on a number of fronts, alleging that:

- land acquired with SNSA funds and held in restricted fee is not subject to the governmental jurisdiction of the SNI and, therefore, cannot be "Indian lands" within the meaning of the IGRA (Complaint ¶¶ 54, 57-58)

- land acquired with SNSA funds is not acquired as part of the "settlement of a land claim" because: 1) the lease dispute between the SNI and its non-Indian tenants was

16

> not a "land claim" within the meaning of the IGRA, and
> 2) the SNSA settlement was final upon the receipt of
> funds; no land was acquired (¶¶ 55, 56, 68)

- the IGRA's "settlement of a land claim" exception does
  not apply to the Buffalo Parcel because the Parcel is
  not held in trust by the United States, as specified in the
  exception, but in restricted fee (¶¶ 46, 48, 53, 66-67)

- the only possible exception to the after-acquired lands
  prohibition that might apply to the Buffalo Parcel
  requires that the Secretary determine whether a gaming
  establishment on newly acquired lands would be
  detrimental to the surrounding community, 25 U.S.C. §
  2719(b)(1)(A), and she did not perform this duty (¶ 69).

Based on these allegations, Plaintiffs assert in their first claim that the NIGC Chairman acted arbitrarily and capriciously by failing to consider whether the SNI's proposed class III gaming would occur on "Indian lands," 25 U.S.C. § 2703(4), when he approved the Ordinance, and that the Secretary acted arbitrarily and capriciously when she declined to disapprove the Compact based on her erroneous interpretations of the IGRA and the SNSA. (Complaint ¶¶ 31, 33, 59, 62.)

In their second claim, Plaintiffs allege arbitrary and capricious action by the NIGC Chairman for failing to consider whether the SNI's proposed gaming would occur on after-acquired lands, 25 U.S.C. § 2719, and by the Secretary for her failure to make required determinations under the IGRA's after-acquired lands provision and its exceptions. (*Id.* ¶¶ 31, 33, 70, 72.)

Plaintiffs assert in their third claim that an Environmental Impact Statement was required prior to placement of the Buffalo Parcel in restricted fee and that the Secretary and the NIGC Chairman have failed to comply with the NEPA. (*Id.* ¶¶ 75, 81-82.)

17

Finally, Plaintiffs' fourth claim alleges that Defendants were required to comply with the NHPA prior to permitting the Buffalo Parcel to attain restricted fee status, but failed to do so. (*Id*. ¶ 86.)

Before considering the substance of these claims, the Court will consider those motions and arguments challenging the Court's subject matter jurisdiction.

## III.  DISCUSSION

In its Motion for Leave to File an *Amicus* Brief, the SNI argues that this action must be dismissed in its entirety pursuant to Federal Rule of Civil Procedure 19 because its presence is necessary and indispensable to a just adjudication of this action, but it cannot be joined as a party because of its sovereign immunity.   The Government argues, as its first ground for dismissal, that the Quiet Title Act is applicable to this action and it therefore must be dismissed in its entirety for lack of subject matter jurisdiction.   Because both of these arguments may be dispositive of all or some of the claims presented, they are considered first.

A.     **SNI'S Motion for Leave to File an *Amicus* Brief**

1.     **Standard for Consideration of *Amicus Curiae* Participation**

A district court has broad discretion to grant or deny an appearance as *amicus curiae* in a given case.   United States v. Ahmed, 788 F. Supp. 196, 198 n.1 (S.D.N.Y. 1992), *aff'd*, 980 F.2d 161 (2d Cir. 1992).   "'The usual rationale for *amicus curiae* submissions is that they are of aid to the court and offer insights not available from the parties.'" Onondaga Indian Nation v. State of New York, 97-CV-445, 1997 U.S. Dist. LEXIS 9168 at *7 (N.D.N.Y. June 25, 1997) (quoting United States v. El-Gabrowny, 844 F. Supp.

18

955, 957 n.1 (S.D.N.Y. 1994)).   Judge Posner concisely described the circumstances

under which an *amicus* brief is desirable in Ryan v. Commodity Futures Trading Comm'n:

> An *amicus* brief should normally be allowed when a party is not represented
> competently or is not represented at all, when the *amicus* has an interest in
> some other case that may be affected by the decision in the present case
> (though not enough affected to entitle the *amicus* to intervene and become
> a party in the present case), or when the *amicus* has unique information or
> perspective that can help the court beyond the help that the lawyers for the
> parties are able to provide.   Otherwise, leave to file an *amicus curiae* brief
> should be denied.

125 F.3d 1062, 1063 (7th Cir. 1997) (citations omitted).

*Amicus* participation goes beyond its proper role if the submission is used to present

wholly new issues not raised by the parties.   Onondaga Indian Nation, 1997 U.S. Dist.

LEXIS 9168 at *8-9 (quoting Concerned Area Residents for the Env't v. Southview Farm,

834 F. Supp. 1410, 1413 (W.D.N.Y. 1993)); Wiggins Bros., Inc. v. Department of Energy,

667 F.2d 77, 83 (Em. App. 1981) (absent exceptional circumstances, *amicus curiae* cannot

implicate issues not presented by the parties).   Furthermore, "an *amicus curiae* is not a

party and has no control over the litigation and no right to institute any proceedings in it,

nor can it file any pleadings or motions in the case."   NGV Gaming, Ltd. v. Upstream Point

Molate, LLC, 355 F. Supp. 2d 1061, 1068 (N.D. Cal. 2005) (citing United States v.

Michigan, 940 F.2d 143, 163-4 (6th Cir. 1991)).

## 2.    The Propriety of SNI's Proposed Submission

The SNI seeks to participate as *amicus curiae* on the grounds that both it and the

State of New York are necessary and indispensable parties to this action, they cannot be

subject to compulsory joinder because of their sovereign immunity and, therefore, this

action must be dismissed in its entirety pursuant to Rule 19.  Rule 19 dismissal is the sole subject of the *amicus* brief the SNI seeks to file.

As Plaintiffs[8] correctly observe, no party has raised the issue of Rule 19 dismissal and, absent exceptional circumstances, courts typically decline to consider issues raised only in an *amicus* brief.  Plaintiffs urge that this procedural infirmity alone is a sufficient basis to reject the SNI's request.

This Court finds it is appropriate to accept the SNI's brief and consider its position for two reasons.  First, the issue of indispensability is one that courts have an independent duty to consider *sua sponte*, if there is reason to believe dismissal on such grounds may be warranted.  Enterprise Mgmt. Consultants, Inc. v. United States *ex rel.* Hodel, 883 F.2d 890, 892-3 (10th Cir. 1989); *see also*, Havana Club Holding, S.A. v. Galleon S.A., 974 F. Supp. 302, 311 (S.D.N.Y. 1997) ("when a court believes that an absentee may be needed for a just adjudication, it may raise compulsory party joinder on its own motion").  In light of the Court's independent duty, the SNI's brief may be helpful in ascertaining whether the SNI is necessary and indispensable such that, in equity and good conscience, the case should be dismissed.

Second, the SNI urges that were this Court to deny its motion and decline to consider its argument, the only avenue the SNI would have to raise the Rule 19 issue would be to move to intervene in this action.[9]  It would then risk waiving the very basis for

---

[8]  Plaintiffs and Intervenor-Plaintiffs filed joint opposition to the SNI's Motion for Leave and Defendants' Motion to Dismiss.

[9]  The SNI does acknowledge that it could attempt to convince an existing party to raise the Rule 19 argument on its behalf.  This Court notes that, on August 16, 2006, it provided "any Party wishing to file a response in support of or in opposition to the [SNI's] Motion" an opportunity to do so.  (Docket No. 46.) Plaintiffs opposed the motion.  Defendants did not file a response and have not otherwise attempted to

its argument—that the SNI is an independent sovereign that cannot be joined in this action.

In this Court's view, the SNI had another option available to it.  As other tribes have done, it could have moved to intervene for the sole purpose of seeking Rule 19 dismissal. *See* <u>Lebeau v. United States</u>, 115 F. Supp. 2d 1172 (D.S.D. 2000); *see also*, <u>Kansas v. United States</u>, 249 F.3d 11213, 1220 (10th Cir. 2001) (tribe reserved right to claim sovereign immunity and intervened only for purposes of joining Government's jurisdictional challenge and raising Rule 19 indispensability issue).  Nevertheless, as a practical matter, requiring the SNI to resubmit its motion in a form Plaintiffs might consider procedurally correct would not alter the posture of this case.  Were the SNI to move to intervene solely to seek Rule 19 dismissal, that issue still would be presented to this Court by an entity claiming sovereign immunity with respect to the underlying claims.

In light of the Court's independent duty to consider possible Rule 19 issues, the inefficiencies attendant to elevating form over substance, and the Court's broad discretion to grant or deny *amicus* motions, this Court finds it appropriate to accept the SNI's brief and consider whether its or the State's joinder is needed for a just adjudication, thereby necessitating dismissal of this action or certain of the claims therein.  This result is not unprecedented.  *See* <u>NVG Gaming, Ltd.</u>, 355 F. Supp. 2d at 1067-69 (after reminding Indian tribe of the limits of *amicus* participation, court considered Rule 19 issue raised solely in *amicus* brief); <u>Artichoke Joe's Cal. Grand Casino</u>, 353 F.3d at 719 at n.10 (after stating that there were no exceptional circumstances warranting consideration of a Rule

---

adopt the SNI's argument.

19 argument raised only in *amicus* brief, the Ninth Circuit went on to consider whether non-party tribes' interests were adequately represented in the case).

### 3.   The Analytical Framework

It is well-settled that a determination of whether a non-party is needed for just adjudication of a dispute involves a two-part inquiry.  Here, this Court must first decide whether the SNI and/or the State is a "necessary" party that should be joined under Rule 19(a).

> A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations by reason of the claimed interest.

FED. R. CIV. P. 19(a).

If it is determined that neither sovereign is necessary, this Court need go no further. However, if either or both are "necessary," sovereign immunity will prevent the compulsory joinder contemplated in Rule 19(a).  This Court must then determine "whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable." FED. R. CIV. P. 19(b).

Rule 19(b) sets forth four factors to consider in determining indispensability:

> [F]irst, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether

22

the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

"[T]he question whether a party is indispensable 'can only be determined in the context of particular litigation.'" American Greyhound Racing, Inc. v. Hull, 305 F.3d 1015, 1018 (9th Cir. 2002) (quoting Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 118, 88 S. Ct. 733, 94 L. Ed. 2d 936 (1968)).  "Such a determination rests in the discretion of the trial judge applying 'equity in [sic] good conscience' to the facts at hand." Fluent v. Salamanca Indian Lease Auth., Civ. 90-1229A at 10 (W.D.N.Y. filed Jan. 25, 1991), aff'd, 928 F.2d 542 (2d Cir. 1991)).

For the reasons stated below, this Court finds that neither the SNI nor the State of New York is necessary to a just adjudication of Plaintiffs' claims.

### 4.    The Necessary Party Determination

With respect to the first consideration under Rule 19(a), it is clear from a review of the Complaint that complete relief can be accorded among the persons already parties to this action in the absence of the SNI and the State.  The absence of either or both would not prevent Plaintiffs from receiving the declaratory and injunctive relief requested relative to the Secretary's and the NIGC's actions.  See Sac and Fox Nation of Missouri v. Norton, 240 F.3d 1250, 1258-59 (10th Cir. 2001), cert. denied sub nom, Wyandotte Nation v. Sac and Fox Nation of Missouri, 534 U.S. 1078, 122 S. Ct. 807, 151 L. Ed. 2d 693 (2002).  The SNI does not argue otherwise.

What the SNI does contend is that it has three significant interests "relating to the subject of the action" which makes it a necessary party.  First, it asserts an interest in "the validity of the gaming compact that [the SNI and the State] duly negotiated and executed."

23

(Docket No. 44 at 14.)   According to the SNI, a key feature of the Compact is its authorization of gaming on lands in Buffalo and the SNI has an interest in the continued viability and operation of that provision.[10]   *Id.*   Second, the SNI claims an "interest in vindicating its rights under the [SNSA]."   *Id.* at 15.   The SNI states that Plaintiffs are challenging its sovereign authority over the Buffalo Creek Territory and that "this challenge . . . goes to the core of the Settlement Act, which expressly contemplates that the [SNI] will enjoy governmental authority over lands acquired pursuant to it . . . ."   *Id.* at 14-15.   Finally, the SNI argues that the Plaintiffs' allegation that the Chairman's approval of the Ordinance violates the IGRA implicates its "governmental interest in the validity of its own laws."   *Id.* at 15.

Contrary to the SNI's characterization, this action does not lie in contract.  Plaintiffs' challenge to the Secretary's approval of the Compact does not call into question the sovereign capacity of the SNI and the State to contract, or the adequacy and validity of their negotiated agreement under state contract law principles.[11]  Similarly, Plaintiffs do not challenge the SNI's right to acquire land in Buffalo and have it placed in restricted fee status under the SNSA, nor do they allege that the SNI was without authority to adopt a

---

[10]   The SNI also argues that the State, as a party to the Compact, has governmental and economic interests in its validity.  The State's purported interests will be addressed separately.

[11]   The SNI specifically seeks to preserve the validity of the provision of the Compact "authorizing" gaming on lands in Buffalo.  This Court notes that the operation of class III gaming on Indian lands is "authorized" by the IGRA and merely regulated by compacts.  25 U.S.C. §§ 2702(1) and 2710(d)(3)(B). The Compact here simply reflects the parties' agreement that sites for SNI gaming will be limited to Indian lands in certain geographic locales and is premised on the assumption that property purchased with SNSA funds will qualify as gaming-eligible Indian lands.  (Compact ¶ 11 and attached Memorandum of Understanding at 1-2.)  The actual creation of gaming-eligible Indian land is not among the issues that parties to a tribal-state compact have authority to negotiate.  25 U.S.C. § 2710(d)(3)(C).  Thus, while the SNI's and State's mutual assumption may be impacted by the outcome of this litigation, their agreement that class III gaming can occur in the City of Buffalo if and when gaming-eligible Indian lands are acquired there will not.

gaming ordinance or that it failed to comply with its own laws when it did so.   Rather,

Plaintiffs are squarely challenging first, the Secretary's determination that the Buffalo

Parcel purchased with SNSA funds is gaming-eligible Indian lands, and second, the

NIGC's approval of the Ordinance, which allegedly did not include any determination on

that issue.[12]

This does not mean the SNI does not have an interest relating to the subject matter

of this action.   In this Court's view, the SNI certainly has an interest in its ability to use

property that it owns in the City of Buffalo in the manner it wishes; namely to construct and

operate a class III gambling casino.[13]   However, the SNI is not a necessary party unless

that interest will, as a practical matter, be impaired or impeded by this suit.

---

[12]   In its *amicus* brief, the SNI focuses primarily on its argument that Plaintiffs ultimately are attacking the validity of the Compact and cites numerous cases holding that all parties to a contract are necessary in an action challenging its validity or interpretation.  *See, e.g.*, American Greyhound Racing, Inc. v. Hull, 305 F.3d 1015 (9th Cir. 2002) (tribe necessary to action seeking to extinguish compact right to automatic renewal); United States ex rel. Hall v. Tribal Dev. Corp, 100 F.3d 476 (7th Cir. 1996) (tribes necessary to action seeking rescission of contracts to which they were parties); Kickapoo Tribe of Indians v. Babbitt, 43 F.3d 1491 (D.C. Cir. 1995) (state necessary to action seeking federal validation of compact that state court had held was invalid); Fluent v. Salamanca Indian Lease Auth., 928 F.2d 542 (2d Cir. 1991) (tribe necessary to action seeking to invalidate leases to which it was party and negotiated settlement agreement under which it was to receive payment); Enterprise Mgmt. Consultants, Inc. v. United States ex rel. Hodel, 883 F.2d 890 (10th Cir. 1989) (tribe necessary to action seeking to validate contract which tribe, in separate action, sought to have declared void); Pueblo of Sandia v. Babbitt, 47 F. Supp. 2d 49 (D.D.C. 1999) (state necessary to suit challenging validity of revenue-sharing provision of compact).  However, the nature of this action is quite different from the direct challenges to contractual rights at issue in the SNI's cited authority, and those cases simply are not applicable here.

This Court notes that the only language the SNI points to in the Complaint that makes specific reference to the Compact's viability is found at paragraph 2 of the Prayer for Relief, which seeks a declaration that "the Compact violates Sections 11(d) and 20 of the IGRA."  (Complaint ¶ 24.)  Plaintiffs' belief that the requested relief is an appropriate remedy should they prevail does not alter the nature of the claims as stated in the body of the Complaint.  The claims themselves do not allege that any Compact term is unlawful, nor do they seek to nullify any contractual benefits for which the SNI could lawfully bargain.  Indeed, Plaintiffs state in their opposing memorandum that "[n]o determination . . . on the issues presented by the parties will change the contract between the SNI and the State."  (Docket No. 52-1 at 11-12).  Plaintiffs again confirmed at oral argument that "[t]here is no problem . . . with the compact itself or the gaming ordinance" and, if Plaintiffs prevail, the Compact will remain valid and effective as to class III gaming occurring on Indian lands.  (Tr. at 90:24-91:17.)

[13]   The strength of this interest obviously hinges on whether the Buffalo Parcel is gaming-eligible Indian land.

25

It is well-settled that potential impairment may be minimized if the absent person is adequately represented by a party to the action. Makah Indian Tribe v. Verity, 910 F.2d 555, 558 (9th Cir. 1990) (citing Wichita and Affiliated Tribes of Oklahoma v. Hodel, 788 F.2d 765, 774 (D.C. Cir. 1986)).  More specifically, the United States may adequately represent an Indian tribe unless there is a conflict between the United States and the tribe. Wichita, 788 F.3d at 774-75.  The Department of the Interior, as trustee for Indian tribes, has an interest in Indian self-government, including tribal self-sufficiency and economic development, that makes it uniquely qualified to represent a tribe's interests unless there is the clear potential for inconsistency between the government's obligations to the tribe and its other obligations in the context of the pending case. Artichoke Joe's, 216 F. Supp. 2d at 1118-19 (citations omitted); see also, Seneca Nation of Indians v. New York, 213 F.R.D. 131, 137 (W.D.N.Y. 2003) ("in the unique context of enforcing restrictions on the alienation of Indian lands, the United States is best situated to provide complete representation of tribal interests and no other party is necessary") (citing Heckman v. United States, 224 U.S. 413, 444-45, 32 S. Ct. 424, 56 L. Ed. 820 (1912)).

In light of the arguments presented in Defendants' Motion to Dismiss and in their vigorous defense against Plaintiffs' Motion for Summary Judgment, it is evident that the Government's interest in defending the propriety of the Secretary's conclusion that the Buffalo Parcel is gaming-eligible Indian lands and the NIGC Chairman's Ordinance approval is substantially similar, if not identical, to the SNI's interest in conducting class III gaming on that Parcel.  See Sac and Fox Nation, 240 F.3d at 1259 (Secretary's interest in defending decision to acquire tract in trust for tribe and its conclusion that tract was

26

gaming-eligible was virtually identical to tribe's interest in conducting gaming; thus any potential impediment or prejudice to tribe was greatly reduced); Kansas, 249 F.3d 1213 (10th Cir. 2001) (government's interest in defending NIGC's Indian lands determination sufficiently similar to tribe's interest in conducting gaming on land to provide adequate representation).  *See also*, Artichoke Joe's, 216 F. Supp. 2d at 1118 (while tribes could claim a legal interest in lawsuit challenging validity of compacts between tribes and State, they were not necessary parties where their legal interest could be adequately represented by the Secretary); Southwest Ctr. for Biological Diversity v. Babbitt, 150 F.3d 1152 (9th Cir. 1998) (tribe was not a necessary party to suit seeking to halt flooding of area where it had right to store water because Secretary and municipal defendants could adequately represent tribe's interest).

The SNI points to no conflict of interest here, but does allege that it is unclear whether the Government will make each and every argument it would make were it a party in the case.  Specifically, the SNI states that it disagrees with the Government's interpretation of the IGRA's after-acquired lands prohibition, 25 U.S.C. § 2719(a) ("gaming regulated by this chapter shall not be conducted on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988").  (Docket No. 56 at 8-9.)  While that may be, all parties to this lawsuit are in accord as to the meaning of the cited provision; its interpretation is not in dispute.  Thus, this Court concludes that the interests of the Government and the SNI are so aligned as to the matters actually in dispute that any concern about impairment to the tribe's ability to protect its interest in this litigation is

alleviated.[14]   *See* <u>Southwest Ctr. for Biological Diversity</u>, 150 F.3d at 1154 (fact that

municipal defendants and non-party tribe disagreed as to interpretation of a settlement

agreement had no bearing on defendants' ability to represent tribe's interests on the merits

of the action where interpretation of settlement agreement was not in dispute).

Of course, the foregoing analysis does not dispose of the question of the State's

interest.  The SNI asserts that it is common for a movant to identify, describe and mount

arguments based on the interests of an absent sovereign.  (Docket No. 44-2 at 3, n.1.)

However, it then goes on to state that it does not purport to speak for the State here and

merely suggests, in conclusory terms, that the State has an "interest" in its anticipated

contractual benefits of revenue-sharing and regulatory input.  *Id.* at n.1 and p. 14.

As has already been determined, this action does not question the validity of or seek

to nullify the Compact.  Moreover, the SNI has not sought to explain, nor can this Court

fathom, how this litigation would invalidate any of the Compact's revenue-sharing or

regulatory provisions.  Although the State's anticipated revenue likely would be diminished

should it ultimately be determined that the Buffalo Parcel is not gaming-eligible Indian

---

[14]   The SNI urges that the Second Circuit has never accepted the view that a tribe's interests can
be adequately represented by a named party.  In <u>Fluent</u>, the case on which the SNI most heavily relies,
the Secretary was not a party to the action, nor was it asserted that any other party was so positioned that
its interest was aligned with the SNI's.  Similarly, in <u>Seneca Nation of Indians v. New York</u>, 383 F.3d 45
(2d Cir. 2004), the Court was not presented with the question of whether any existing party could
adequately represent the interests of the People of the State of New York.  There is a clear difference
between not having been presented with the question and rejecting the premise.  This, of course, is in
addition to the distinction drawn above between cases challenging a non-party sovereign's contractual
rights and those challenging federal agency action.  At least one other district in this circuit has implicitly
recognized that distinction and found that the Secretary could adequately represent a tribe's interest in a
challenge to the Secretary's decision relative to trust land.  <u>State of Conn. ex rel. Blumenthal v. Babbitt</u>,
899 F. Supp. 80 (D. Conn. 1995) (alleging violations of IGRA, a settlement act, and NEPA).  Moreover,
though speaking to the matter in *dicta*, the Second Circuit stated, in a case challenging government
decisions relating to the development of a casino, that it was "not certain that dismissing plaintiffs'
complaint on Rule 19 grounds would be consistent with our duty to review such agency determinations."
<u>Shenandoah v. United States DOI</u>, 159 F.3d 708, 715 (2d Cir. 1998).

lands,[15] it is well-settled that "the prejudice to an absent party must be more than merely financial to weigh in favor of dismissal under Rule 19(b)." Pueblo of Sandia v. Babbitt, 47 F. Supp. 2d 49, 53 (D.D.C. 1999) (citing Makah, 910 F.2d at 558 (9th Cir. 1990)).  In this Court's view, where a contract term remains unaltered, but the monetary benefit is less than anticipated, the consequence is merely financial.

This Court also has considered what interest the State may have as this action is properly framed; as a challenge to agency action under the APA and the IGRA with respect to the Buffalo Parcel.   The IGRA's legislative history notes that its enactment was prompted, in part, by states' concerns over the potential for criminal elements to infiltrate Indian gaming activities and their desire to regulate such activities consistent with their own public policy, safety, law enforcement and regulatory interests.   S. Rep. No. 100-446 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071, 3075-76, 3083.  Assuming New York State has the same interests and concerns identified by Congress in 1988, there is no aspect of Plaintiffs' challenge to federal agency action that will impair the State's ability to regulate, by tribal-state compact, the conduct of class III gaming activities on gaming-eligible Indian lands.   Accordingly, this Court finds that the State is not necessary to a just adjudication of this suit.

Finally, the SNI has not argued, and this Court is not otherwise convinced, that any party to this suit would be subjected to a substantial risk of multiple or inconsistent obligations in the absence of the SNI or the State.

---

[15] This Court notes that the State's revenue would be similarly diminished if the SNI simply chose not to operate three class III gaming facilities.  The Compact provides that the SNI may establish facilities in three locales; it does not require that the SNI do so.  (Compact ¶ 11.)

For the reasons stated, this Court finds that neither the SNI nor the State of New York is a necessary party to this action.  In light of this determination, there is no need to conduct the Rule 19(b) four factor indispensability analysis.  *See* Matercard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc., Docket Nos. 06-4433-cv(L), 06-4947-cv(CON), 2006 U.S. App. LEXIS 31248, at *32-33 (2d Cir. Dec. 18, 2006) (citing Viacom Int'l, Inc. v. Kearney, 212 F.3d 721, 724 (2d Cir. 2000) ("If a party does not qualify as necessary under Rule 19(a), then the court need not decide whether its absence warrants dismissal under Rule 19(b).")); NGV Gaming, Ltd., 355 F. Supp. 2d at 1069, n.8 (tribe was not a necessary party and, therefore, court declined to proceed to question of indispensability); Artichoke Joe's, 216 F. Supp. 2d at 1120, n.47 (because court found that tribes were not necessary parties, it declined to consider whether they were indispensable under Rule 19(b)).

**B.    Subject Matter Jurisdiction**

In its Motion to Dismiss, the Government urges that this Court lacks subject matter jurisdiction over this action because, based on the nature of the claims presented, the United States has not waived its sovereign immunity to suit.  Defendants rely on the Quiet Title Act ("QTA"), 28 U.S.C. § 2409a, which provides, in pertinent part, that:

> The United States may be named as a party defendant in a civil action under this section to adjudicate a *disputed title* to real property in which the United States claims an interest, other than a security interest or water rights. *This section does not apply to trust or restricted Indian lands . . . .*

28 U.S.C. §2409a(a) (emphasis supplied); *see* United States v. Mottaz, 476 U.S. 834, 843, 106 S. Ct. 2224, 90 L. Ed. 2d 841 (1986) (when U.S. claims interest in real property based on its status as trust or restricted Indian land, the QTA does not waive government's immunity).

30

According to the Government, the QTA applies because Plaintiffs are seeking a determination that would remove the Buffalo Parcel from restricted fee status.  (Docket No. 22-2 at 11, 14, 16.)  The Government does acknowledge that Plaintiffs are not explicitly seeking to quiet title to the Buffalo Parcel and are not claiming any adverse ownership interest in the property.  But it contends, nevertheless, that this case falls within the QTA's reservation of immunity.  (*Id.* at 11.)

As the Government correctly notes, this Court must focus on the nature of the relief requested in considering the QTA's applicability.  Mottaz, 476 at 843.  If the true purpose of the litigation is to challenge title, then the QTA applies no matter how the claims are characterized.  *See* Ducheneaux v. Sec'y of Interior, 837 F.2d 340 (8th Cir. 1988) (suit brought under APA in which individual claimed an adverse ownership interest in land held in trust by United States was barred by QTA); Florida Dep't of Bus. Regulation v. United States DOI, 768 F.2d 1248 (11th Cir. 1985) (suit brought under APA which sought to divest United States of title to land it had taken into trust was barred by QTA).

In reviewing Plaintiffs' Complaint here, this Court finds that there is no challenge to the title to the Buffalo Parcel, express or implied, in the claims or the requested relief.  As Defendants appear to concede, the claims brought under the IGRA challenging the Secretary's and NIGC Chairman's decisions to approve the Compact and Ordinance (claims One and Two) have nothing to do with the SNI's acquisition of title to the Buffalo Parcel some three years afterward and its placement in restricted fee status.  (Docket No. 22-2 at 13.)  Even were this Court to determine that the NIGC's or Secretary's actions were

arbitrary and capricious, the SNI would retain title to the Buffalo Parcel in restricted fee.[16]

In their NEPA and NHPA claims (Three and Four), Plaintiffs allege that "the actions of the defendants which placed the Buffalo [Parcel] in restricted fee . . . required the preparation of an Environmental Impact Statement" and that "Defendants violated the NHPA by failing to consult with the Advisory Council for Historic Preservation" prior to permitting the Buffalo Parcel to attain restricted fee status.  (Complaint at ¶¶ 75, 86.) Though not expressly requested in Plaintiffs' prayer for relief, this Court notes that a finding that the Government was required to comply with NEPA and NHPA prior to placing the Buffalo Parcel in restricted fee status could result in the reversal or vacatur of that agency action.[17]

Nevertheless, as set forth in the undisputed Factual Background, *supra* at 12-13, the SNI acquired the Buffalo Parcel on October 3, 2005, and only *afterward* requested that the Parcel be placed in restricted fee status.  A determination on the validity of the latter action in no way divests the SNI of its earlier-acquired title to the property.[18]  Whether the property is held in fee simple or restricted fee, this lawsuit does not challenge the SNI's

---

[16] Plaintiffs IGRA claims are challenging the determinations that the Parcel's restricted fee status qualifies it as "Indian lands," and that the Parcel falls within the settlement of a land claim exception to the IGRA's after-acquired lands prohibition on gaming.  While these challenges certainly have implications for the property's lawful uses, they have no potential to divest the SNI of title to the Buffalo Parcel or to alter the restricted fee status of the property.

[17] Defendants conceded at oral argument that placement of the Buffalo Parcel in restricted fee is a final agency action for purposes of the APA.  (Tr. 24:21-24.)

[18] The Buffalo Parcel is held in restricted fee status because it was acquired with SNSA funds, 25 U.S.C. § 1774f(c), and the Secretary did not determine that the land should not be subject to the Nonintercourse Act, 25 U.S.C. § 177.  "The obvious purpose of the Nonintercourse Act is to prevent unfair, improvident, or improper disposition by Indians of lands *owned or possessed by them* to other parties . . . [by enabling the Government] to vacate any disposition of their lands made without its consent."  Federal Power Comm'n v. Tuscarora Indian Nation, 362 U.S. 99, 119, 80 S. Ct. 543, 4 L. Ed. 2d 584 (1960) (citations omitted) (emphasis supplied).  Thus, removing the restriction on fee would merely permit the SNI to dispose of property it owns at any time and in any manner it chooses.

ownership of the Buffalo Parcel and the SNI will retain title regardless of the outcome of this action.[19]

Although the Government attempts to distinguish this case on its facts from <u>Kansas v. United States</u>, 249 F.3d 1213 (10th Cir. 2001), this Court finds the reasoning of that case applicable here.  In <u>Kansas</u>, the plaintiffs challenged the NIGC Chairman's decision that a tract of non-reservation land was "Indian lands" within the meaning of the IGRA.  The Tenth Circuit first noted that "only disputes pertaining to the United States' ownership of real property fall within the parameters of the QTA."  *Id*. at 1224 (*citing* <u>Dunbar Corp. v. Lindsey</u>, 905 F.2d 754, 759 (4th Cir. 1990) ("Any challenge to a non-ownership interest in real property is not precluded by the QTA.")).  The Court went on to hold that:

> [A]djudicating the question of whether a tract of land constitutes "Indian lands" for Indian gaming purposes is conceptually quite distinct from adjudicating title to the land.  One inquiry has little to do with the other as land status and land title are not congruent concepts in Indian law.  A determination that a tract of land does or does not qualify as "Indian lands" within the meaning of IGRA in no way affects title to the land.  Such a determination would merely clarify sovereignty over the land in question.

*Id*. at 1225 (internal citations and quotation marks omitted).  *See also*, <u>Neighbors for Rational Dev., Inc. v. Norton</u>, 379 F.3d 956, 965 (10th Cir. 2004) (QTA precluded plaintiffs' suit to the extent it sought to nullify the United States' acquisition of trust land, but request for injunction preventing development of property until the Secretary complied with NEPA would not be precluded).

---

[19] While restricting fee on property is an act that allows the United States to claim an interest in the real property for purposes of the QTA in the first place, the QTA applies only if the dispute is one that seeks to adjudicate title.  No such dispute exists here.

So, too, the question of fee simple versus restricted fee is one of sovereignty, rather than ownership.  Assuming that the Buffalo Parcel is restricted Indian land such that the United States claims an interest, the Parcel's title is not in danger of divestiture as a consequence of this lawsuit and, therefore, the QTA is not applicable.  Accordingly, Defendants' motion to dismiss this action in its entirety for lack of subject matter jurisdiction is denied.

**C.    APA Review**

Plaintiffs bring their claims primarily under the APA, and request that this Court review various agency actions, alleged failures to act and statutory interpretations by the NIGC and the Secretary that are claimed to be deficient or erroneous.  The APA provides that a reviewing court must "set aside agency action" that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(a).

Among their opposing arguments, Defendants urge that the NIGC's failure to make an Indian lands determination is unreviewable because the NIGC is not statutorily required to make such a determination in the first place; the NIGC's approval of tribal gaming ordinances is subject to only limited review; the Secretary's November 12, 2002 opinion letter is not a final agency action and is therefore unreviewable; and even if reviewable, the Secretary's statutory interpretation is entitled to deference.

In light of the centrality of the APA to the allegations in the Complaint and the issues and arguments raised in the parties' respective motions, this Court must first consider its role when confronted with such challenges to agency action.

1.    **Standard of Review**

Where the agency decisions at issue involve interpretations of federal statutes the agency administers, the court's review is guided by the principles announced in Chevron, U.S.A., Inc. v. Natural Res. Defense Council, Inc., 467 U.S. 837, 842-43, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984). Chevron confirmed that "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Id.* at 843 n.9. Thus, courts are to look first to "whether Congress has directly spoken to the precise question at issue." *Id*. at 842.

> If the intent of Congress is clear, that is the end of the matter; for the Court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 842-43.

Where an agency has been delegated authority to elucidate the statute by regulation, its "regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id*. at 844. However, the Chevron deference that is accorded to regulations adopted by formal rule-making does not apply to all forms of agency interpretations. Schneider, 345 F.3d at 142 (citing Christensen v. Harris County, 529 U.S. 576, 586-87, 120 S. Ct. 1655, 146 L. Ed. 2d 621 (2000)). Interpretations such as opinion letters, policy statements, agency manuals and enforcement guidelines lack the force of law and do not warrant Chevron-style deference. Christensen, 529 U.S. at 587.

Rather, interpretations contained in such formats are entitled to respect under the Supreme Court's decision in Skidmore v. Swift & Co., 323 U.S. 134, 65 S. Ct. 161, 89 L. Ed. 124 (1944), but only to the extent that, through the writer's thoroughness, logic, expertise, consideration of prior interpretations and the like, the interpretation at issue has the power to persuade.  United States v. Mead Corp., 533 U.S. 218, 235, 121 S. Ct. 2164, 150 L. Ed. 2d 292 (2001).

When a court is asked to review the reasonableness of an agency's decision-making action, its inquiry is governed by Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983):

> The scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action . . . .  Normally, an agency [action] would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

> Id. at 43 (citations and quotation marks omitted) (alteration added).

## 2.     Review of Final Agency Action under the  IGRA

It is first to be noted that Section 704 of the APA provides for review as follows:

> Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action.

Significantly, the IGRA expressly provides for APA review:

36

> Decisions made by the [NIGC] pursuant to sections 2710, 2711, 2712, and 2713 of this title shall be final agency decisions for purposes of appeal to the appropriate Federal district court pursuant to chapter 7 of Title 5.

25 U.S.C. § 2714.  Thus, the NIGC Chairman's approval of the SNI's Ordinance pursuant to 25 U.S.C. § 2710(d) is a final agency action for purposes of reviewing both the reasonableness of the Chairman's decision-making and the permissibility of any statutory construction he may have undertaken in this case.

In enacting the IGRA, Congress established the NIGC as an independent agency charged with exclusive regulatory authority for Indian gaming on Indian lands.  *Id*. §§ 2702(3), 2704; Sac and Fox Nation, 240 F.3d at 1265 (though nominally under the Department of the Interior, NIGC functions as an independent entity); NIGC website (www.nigc.gov/AboutUs/tabid/56/Default.aspx) (NIGC is "an independent federal regulatory agency of the United States").  NIGC is charged with, among other things, "promulgating such regulations and guidelines as it deems appropriate to implement the provisions" of IGRA and, by implication, has primary authority to interpret any ambiguous phrases or terms contained in the IGRA.  25 U.S.C. § 2706(b)(10).  Since the NIGC is the agency expressly charged by Congress with administering the IGRA, this Court finds that a NIGC interpretation of IGRA provisions is properly afforded Chevron deference.

On the other hand, the Secretary is delegated only some duties under the IGRA, and none of those duties are identified in § 2714 as final agency actions.  As such, the views set forth in the Secretary's November 12, 2002 opinion letter do not represent the final product of agency deliberation as to whether the Buffalo Parcel is gaming-eligible Indian lands.  Miami Tribe of Oklahoma v. United States, No. 05-3085, 2006 U.S. App. LEXIS 21524, at *10-12 (10th Cir. Aug. 21, 2006) (DOI opinion letter on tribe's sovereignty

over land for purposes of the IGRA was not final agency action). However, the Secretary's opinion letter does represent an intermediate step in a process that eventually should result in a final action.[20] *Id.* at *11.

Where final agency action has occurred, the Secretary's letter is reviewable under the APA. 5 U.S.C. § 704. There is no deference owed to the Secretary's interpretation of the IGRA's terms on such review, however, because neither the Secretary nor the Department of the Interior is charged with that statute's administration. Sac and Fox Nation, 240 F.3d at 1265-66 (Secretary's decision to acquire land in trust pursuant to 25 U.S.C. § 465 was final agency action within his purview, but court declined to give any deference to Secretary's related opinion that the land was gaming eligible "Indian lands" for purposes of the IGRA where he does not administer that statute).

**D.    The NIGC'S Approval of the SNI's Tribal Gaming Ordinance**

It is Plaintiffs' position in this lawsuit that land acquired with SNSA funds, as the Buffalo Parcel was,[21] is not subject to the SNI's governmental jurisdiction and, therefore, does not fall within the IGRA's definition of "Indian lands." (Complaint ¶¶ 54, 59.) Moreover, even if it did, Plaintiffs argue the Buffalo Parcel is not gaming-eligible Indian land because it was not "taken into trust as part of a settlement of a land claim" and, therefore, is not excepted from the prohibition on gaming on lands acquired after October 17, 1988. (*Id*. ¶¶ 67-68.) Given those deficiencies, according to Plaintiffs, the NIGC Chairman acted arbitrarily and capriciously when he approved the Ordinance without making an "Indian

---

[20]  The letter was issued in connection with the Secretary's consideration of the Compact which, in turn, had to be submitted to the NIGC Chairman in connection with his consideration of the Ordinance.

[21]  The source of funds used to acquire the Buffalo Parcel is undisputed. (Tr. 27-28.)

land" determination with respect to property the SNI intended to acquire for gaming purposes.  (*Id.* ¶¶ 60, 62, 72.)

Here, the Government has moved to dismiss all claims against the NIGC and its Chairman pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  With respect to Plaintiffs' IGRA claims, the Government argues that the Chairman was presented with a tribal gaming ordinance that did not specify gaming sites,[22] and he therefore was mandated to approve the Ordinance so long as: 1) it met all technical requirements for submission, and 2) neither of the statutorily specified reasons for disapproval were present. (Docket No. 22-2 at 32-34); *see generally*, 25 U.S.C. § 2710(d).  In sum, the Government urges that because Plaintiffs do not allege any error with respect to those limited considerations, and for that reason alone, Plaintiffs' IGRA claims must be dismissed for failure to state a claim.

In addition, at oral argument, the Government argued that there is no provision of the IGRA that requires the Chairman to make an Indian lands determination.  Thus, if a tribe proceeds to conduct gaming on non-Indian lands in violation of the IGRA, the NIGC is to deal with the issue on the enforcement side of the statute.  (Tr. 34-35.)

Plaintiffs' response to the Government's arguments is cursory.  It simply directs the Court to paragraph 60 of the Complaint (NIGC failed to make an Indian lands determination) and their Summary Judgment Motion (a concluding paragraph which states

---

[22]   The Ordinance states as follows: "The Tribal Council finds that—(a) Class III gaming may be conducted on *lands of the Nation* by reason of the fact that the Nation and the State of New York have entered into a gaming compact pursuant to the Indian Gaming Regulatory Act . . . ."  (Docket No. 17-5 ¶ 3.) (emphasis supplied).  The Ordinance does not expressly identify the three sites specified in the Compact.

that approval of the Ordinance was "arbitrary, capricious, an abuse of discretion, contrary to law, and in violation of procedures required by law").  (Docket No. 39-10 at 34-35.)

Against this backdrop, this Court sought to ascertain at oral argument whether Plaintiffs had abandoned their claims against the NIGC Defendants.  Plaintiffs disclaimed abandonment and urged that an Indian lands determination is "an overarching requirement of IGRA." (Tr. 82-83.)  They also argued, generally, that "there's never been a proper determination" on whether the Buffalo Parcel is gaming-eligible Indian lands.  (*Id.* 33.) Because Plaintiffs have disclaimed abandonment, this Court necessarily turns to an examination of the sufficiency of the Government's arguments for dismissal.

The first issue that must be addressed is the Government's contention that the IGRA does not require the NIGC to make "Indian lands" determinations in connection with ordinance reviews.  It is evident from a plain reading of the IGRA that the NIGC's jurisdiction extends only to Indian gaming that occurs <u>on Indian lands</u>.  25 U.S.C. §§ 2701(3), 2702(3) (Congress notes absence of, and finds need for, establishment of independent regulatory authority for gaming <u>on Indian lands</u>) (emphasis supplied).  Class III gaming is lawful only "<u>on Indian lands</u>" and only if an ordinance authorizing such gaming "is adopted by the governing body of the Indian tribe <u>having jurisdiction over such lands</u>." *Id.* § 2710(d)(1) (emphasis supplied).

When the Chairman is presented with an ordinance, the statute directs that he act on it within 90 days.  *Id*. § 2710(e).  He must approve an ordinance where the tribe's submission comports with § 2710(d)(2)(A).  *Id*. § 2710(d)(2)(B).  The requirements are that: 1) the tribe is proposing to engage in class III gaming activity <u>on Indian lands of the Indian</u>

tribe, and 2) its governing body has adopted an ordinance that meets the requirements of § 2710(b).   The first requirement clearly necessitates a determination that gaming is proposed to be sited on Indian lands over which the tribe has jurisdiction.

Beyond that, the findings, purpose and language of the IGRA relative to the NIGC's jurisdiction implicitly require such a determination.   Whether proposed gaming will be conducted on Indian lands is a critical, threshold jurisdictional determination of the NIGC. Prior to approving an ordinance, the NIGC Chairman must confirm that the situs of proposed gaming is Indian lands.  If gaming is proposed to occur on non-Indian lands, the Chairman is without jurisdiction to approve the ordinance.

The Court also expressly rejects the Government's "no harm, no foul" approach at oral argument.  There, the Government urged that if a tribe is "violating IGRA in that they're gaming on lands acquired after 1988, or lands that are not Indian lands," the NIGC can conceivably go in "and say, you know, we've changed our minds, we don't think this parcel is [Indian lands] and have an enforcement action . . . ."  (Tr. 25-26; also, 34-35.)

This Court disagrees.   In fact, such an enforcement action appears to be an impossibility.  Because the NIGC's jurisdiction is limited to oversight of gaming on Indian lands, its civil enforcement powers can not extend to gaming on non-Indian lands.  This jurisdictional limitation is reflected in the NIGC's own regulations, which provide for closure orders and fines in a number of circumstances involving violations of the IGRA, such as where a tribe fails to pay required fees; operates a gaming facility without an approved tribal ordinance, tribal-state compact or management contract, where required; operates a Class II gaming machine without a license from a tribe in violation of 25 C.F.R. § 558; fails to have proper background investigations or licenses pursuant to 25 C.F.R. § 558.3;

41

or where there is evidence of fraud.  25 C.F.R. §§ 573 and 575.  Conspicuously absent from the NIGC's own list is any reference to enforcement relative to the conduct of Indian gaming on non-Indian lands.

In sum, the NIGC is the gatekeeper for gaming on Indian lands and, when acting on a tribal gaming ordinance, it has a duty to make a threshold jurisdictional determination. If, by the Chairman's action or inaction, a tribe establishes a gaming operation on non-Indian lands, it follows that the NIGC has no jurisdiction thereafter to fine or close that unlawful operation.  Accordingly, the Court determines that the Government's motion to dismiss on the ground that the IGRA does not require the NIGC Chairman to make an Indian lands determination when acting on a gaming ordinance must be denied.

Having found that the NIGC Chairman has a duty to determine whether a tribe's proposed gaming will occur on Indian lands before affirmatively approving an ordinance, this Court now turns to the question of the reasonableness of the Chairman's decision-making in this case.  According to the Government, the Chairman acted appropriately and in conformance with the law when he approved the Ordinance here because the SNI proposed to game on "lands of the Nation" generally, and defined "Nation lands" as having the meaning found in the IGRA, 25 U.S.C. § 2703(4).  (Docket No. 17-5 ¶¶ 3, 4.)  This Court has reviewed the NIGC's administrative record as a whole, and concludes that it does not support a finding of reasonableness as to the Chairman's actions.

The NIGC Chairman approved the SNI's Ordinance on November 26, 2002.  This Court first notes that the Secretary did not forward a copy of her November 12, 2002 opinion letter to the NIGC.  (Docket No. 25-2.) Moreover, the NIGC's administrative record is devoid of any indication that the NIGC otherwise received notice of the Secretary's

42

opinion that real property the SNI intended to purchase with SNSA funds and hold in restricted fee pursuant to the SNSA would qualify as gaming-eligible Indian lands under the IGRA.  (Docket No. 17, *generally.*)  Thus, the record fails to support or even suggest that the NIGC considered and adopted the Secretary's opinion.

The Government argues, however, that the Chairman's role here was limited to considering what appeared on the face of the SNI's duly adopted gaming ordinance, which proposed gaming on "Nation lands" meeting the IGRA's Indian lands definition.  (Docket No. 22-2 at 34.)

But, as the Government also notes, a tribe's ordinance will not pass muster unless it meets numerous content, submission, authenticity and reliability requirements.  *Id.* at 32-33; 25 U.S.C. § 2710(b)(2)-(3); 25 C.F.R. §§ 522.2, 522.6.  The tribal-state compact is one of the requisite submissions.  In this case, the Compact specifically sets forth the SNI's intent to acquire new land for gaming, circumscribes the locations in which such purchases can be made, and defines both the manner in which the land will be acquired and the status in which it will be held.[23]

The Government suggests in its argument that the Chairman has discharged his duty by simply ascertaining that a tribe and state have entered into a compact under 25 U.S.C. § 2710(d)(3); he is not obliged to actually review the compact.  This Court

---

[23]   As noted previously, the Compact reflects the SNI and State's agreement that class III gaming facilities will be limited to the three locales identified therein: a location in the City of Niagara Falls identified on an appended map, a location in Erie County yet to be determined, and a location on the SNI's current reservation territory.  (Compact ¶ 11).  The Compact also states that both the City of Niagara Falls and Erie County sites would be purchased with SNSA funds, pursuant to the procedure set forth in 25 U.S.C. § 1774f(c), and that the SNI would apply for their placement in restricted fee status. The Niagara Falls site identified in the Compact was so purchased by the SNI on October 25, 2002, prior to the SNI's submission of its amended Ordinance to the NIGC, and gaming has been in operation there for some time.

expresses no view on whether such limited review, as a general principle, may sometimes be sufficient.   What is clear from the record here, though, is that the Ordinance and Compact were submitted to the Chairman as an integrated document, thereby necessitating the Chairman's review of the Compact in this case.   In a memorandum to the NIGC Chairman,[24] the SNI's counsel stated:

> Th[is] memorandum has been prepared to simplify and expedite the review and approval of the Seneca Nation of Indians Class III Gaming Ordinance of 2002 (Ordinance).  While the Ordinance itself addresses the majority of those requirements found in IGRA and the National Indian Gaming Commission's (NIGC) implementing regulations, *some required items and provisions are found in the "Nation-State Gaming Compact Between The Seneca Nation of Indians and the State of New York" (Compact), executed on August 18, 2002, and its related Appendices.*  Because the Appendices to the Compact are extremely long and technical, we have prepared the attached memorandum identifying where each statutory and regulatory requirement is satisfied and/or addressed in the Ordinance and/or the Compact and its Appendices.

(Docket No. 17-1 at 1.) (emphasis supplied).

Here, the Chairman could not have ascertained that all statutory and regulatory submission and content requirements had been met without reviewing the Compact.  That review would necessarily have brought the anticipated land purchases, their status as post-1988 land acquisitions, their locales, their method of purchase and their anticipated restricted fee status to the Chairman's attention.  In light of these circumstances, there are only two conclusions reasonably to be drawn; either the Chairman did not review the Compact and therefore did not adequately ascertain that all prerequisites to ordinance

---

[24]  The memorandum was submitted with the SNI's original ordinance.  The record indicates that only "minor technical revisions" relating to certain procedures were made in the amended ordinance. (Docket No. 17-5 at 24).  Thus, at least in large measure, the memorandum appears to relate to the amended ordinance, as well.

approval were met,[25] or he did review the Compact and failed to consider whether the NIGC had jurisdiction to approve an ordinance for gaming on the after-acquired properties identified for purchase therein.   The fact that no Indian lands or gaming eligibility determinations were made with regard to the to-be-acquired Compact sites is apparent from the Chairman's one-page approval letter, which merely states, without discussion, that "[i]t is important to note that the gaming ordinance is approved for gaming only on Indian lands, as defined in the IGRA, over which the Nation has jurisdiction." (Docket No. 17-10.)

For the reasons stated, the Government's motion to dismiss Plaintiffs' IGRA claims for failure to state a claim against the NIGC and its Chairman is denied.   Beyond that, based on this record, this Court must conclude that the information presented to the NIGC Chairman and the manner in which it was presented was sufficient to require that he: 1) make an Indian lands determination regarding the to-be-purchased sites identified in the Compact before acting on the Ordinance, and 2) provide a reasoned explanation for his conclusions.    Absent the Chairman's consideration and explanation of this critical jurisdictional issue, this Court has no basis upon which it can conclude that the Chairman's approval of the Ordinance was the result of reasoned decision-making.   Accordingly, this Court is compelled to find that the Ordinance approval with respect to the Buffalo Parcel was arbitrary and capricious.

The foregoing conclusions, necessarily reached in considering the Government's arguments on its Motion to Dismiss, also require that this Court take some further action.

---

[25]  This conclusion appears unlikely, however, in light of the NIGC's apparent communication with the SNI in early 2002 regarding technical deficiencies in its submission package and the SNI's related ordinance amendment.  (*See* Docket No. 17-5.)

It is noted that Plaintiffs' requested relief is not in accord with the conclusions reached herein.

For example, Plaintiffs request that this Court set aside the decision of "the Chairman of the [NIGC], approving the Seneca Nation Class III Gaming Ordinance." (Complaint, Prayer for Relief ¶ 7(b).)  This request is far too broad, particularly in light of Plaintiffs' statements at oral argument that the SNI is lawfully gaming on its Allegany Reservation and that Plaintiffs are challenging the ordinance "just to the extent that [it is] applied to th[e Buffalo] parcel."  (Tr. 91:12-17.)

Furthermore, this Court understands that its proper role on APA review is to consider the decision-making and/or statutory interpretation involved in a final agency action.  Absent any evident consideration of the "Indian lands" issue or any statutory interpretation of the IGRA by the NIGC in this case, it would be premature to cede to Plaintiffs' request that this Court interpret the IGRA and declare that lands acquired by the SNI pursuant to the SNSA are not "Indian lands" within the meaning of the statute.  (Prayer for Relief ¶ 1.)  This is a determination that the NIGC must have an opportunity to make in the first instance, in that it is charged with administering and interpreting the statute.

In keeping with the proper allocation of responsibilities between federal agencies and the courts, this Court finds it is appropriate to vacate only that portion of the NIGC Chairman's approval of the Seneca Nation of Indians Class III Gaming Ordinance of 2002 as Amended that permits gaming on land "in Erie County, at a location in the City of Buffalo to be determined by the Nation" (Compact ¶ 11(a)(2)), and to remand the matter to the

NIGC for further consideration consistent with this opinion.[26]   *See* Immigration and Naturalization Serv. v. Ventura, 537 U.S. 12, 16-17 (2002) (generally, court should remand case to agency for decision on a matter that statutes place primarily in agency hands; agency can bring expertise to bear upon matter and can, through informed discussion and analysis, "help a court later determine whether its decision exceeds the leeway the law provides"); Grand Traverse Band of Ottowa and Chippewa Indians v. United States, 46 F. Supp. 2d 689, 706-707 (W.D. Mi. 1999) (district court applied primary jurisdiction doctrine to seek NIGC determination on whether casino was sited on gaming-eligible Indian lands in light of the NIGC's special competence and its charge to interpret and apply the IGRA); Miami Tribe of Oklahoma v. United States, 5 F. Supp. 2d 1213, 1217-19 (D. Kan. 1998) (reversing and remanding NIGC decision to disapprove management contract because parcel was not Indian lands where NIGC failed to provide a reasoned explanation for its decision).

On remand, the NIGC Chairman is instructed to determine whether the Buffalo Parcel is "Indian lands" as defined in the IGRA; to consider, if necessary, the applicability of section 20 of the IGRA, 25 U.S.C. § 2719, to the Buffalo Parcel; and to provide an explanation of the bases for his determinations.   The Chairman's Ordinance approval remains in effect as to all other sites identified in the Compact.[27]

---

[26]   This Court considered whether it could remand this matter without vacating the Chairman's Ordinance approval as to the Buffalo Parcel.  However, this Court concluded that vacatur is necessary in order to afford the NIGC an opportunity to complete its review on remand before the SNI actually commences gaming on the Buffalo Parcel.

[27]   This Court is well-aware that there is a site the SNI may have purchased in the same manner as the Buffalo Parcel on which it presently is conducting gaming operations.  However, this litigation relates solely to the Buffalo Parcel and relief is appropriately tailored to the site in dispute.   Moreover, the Buffalo Parcel is the only site for which the NIGC may still determine whether *proposed* gaming will occur on Indian lands.  On all other sites, gaming already is a reality.

**E.      The Remaining Claims and Motions**

The Government repeatedly has urged, and this Court agrees, that the Secretary's November 12, 2002 letter is merely a legal opinion that does not constitute final agency action under the IGRA for purposes of APA review.   There is no basis in the record from which this Court can conclude that the NIGC considered any of the opinions expressed in the Secretary's letter or took any other action with respect to an Indian lands determination. Because there has been no final agency determination as to whether land purchased in the City of Buffalo with SNSA funds is gaming-eligible Indian lands, Plaintiffs' challenge to the Secretary's intermediate statutory interpretations is premature and this Court is without jurisdiction to review her opinions at this juncture.  <u>Miami Tribe of Oklahoma</u>, 2006 U.S. App. LEXIS 21524.   Accordingly, Plaintiff's IGRA claims (One and Two) against the Secretary are dismissed for lack of subject matter jurisdiction.

Plaintiffs' NEPA and NHPA claims against all Defendants, and their IGRA claims against Defendant James Cason, are predicated on agency actions that permitted the SNI to construct and operate an Indian gambling casino on the Buffalo Parcel.  Having vacated and remanded the Chairman's Ordinance approval to the extent it authorizes gaming on land "in Erie County, at a location in the City of Buffalo," these claims are now moot and are dismissed in their entirety.   Given this dismissal, Plaintiffs' Motion for Summary Judgment is denied as moot.   Finally, because this Court had no need to consider Plaintiffs' extra-record exhibits or its Memorandum in Support of Summary Judgment in reaching its determinations herein, the Government's Motion to Strike is denied as moot.

## IV.  CONCLUSION

For the reasons stated, the Seneca Nation of Indians' Motion for Leave to File an *Amicus* Brief is granted.  However, the SNI's request for Rule 19 dismissal is denied based on this Court's determination that neither the SNI nor the State of New York are necessary to a just adjudication of this action.  While the SNI clearly has an interest in operating a gambling casino on property it purchased in the City of Buffalo, its interest is adequately represented here by the Defendants, who are defending their decisions to permit such gaming.  The State does not have an interest that will be impaired, as a practical matter, by this litigation.

That portion of Defendants' motion to dismiss which claims immunity from suit under the QTA is denied.  The Plaintiffs are not challenging the SNI's title to the Buffalo Parcel and, therefore, QTA immunity does not apply.  That portion of Defendants' motion to dismiss which seeks dismissal of claims One and Two (the IGRA claims) against the Secretary for lack of subject matter jurisdiction is granted.  Because the Secretary's "Indian lands" determination is not final agency action, and no final agency action has yet occurred with respect to that determination, this Court lacks jurisdiction to review the Secretary's challenged statutory interpretations.  Finally, that portion of Defendants' motion seeking dismissal of claims One and Two against the NIGC Chairman for failure to state a claim is denied.  The NIGC is the agency expressly charged with administering the IGRA.  Before approving a tribal gaming ordinance, the NIGC Chairman must necessarily establish, as a threshold jurisdictional matter, that gaming is permitted on the land in question—*i.e.*, that the land is "Indian lands" within the meaning of the IGRA.  Plaintiffs' allegation that the

NIGC did not make an "Indian lands" determination with respect to land the SNI intended to purchase in the City of Buffalo sufficiently states a claim for relief.  In sum, Defendants' Motion to Dismiss is granted in part, and denied in part.

Based on its review of the administrative record, this Court finds that the NIGC should have, but did not, make an Indian lands determination in this case.  Accordingly, this Court concludes that the Chairman's 2002 approval of a gaming ordinance permitting the SNI to conduct gambling on lands to be acquired in Erie County in the City of Buffalo was not the result of reasoned decision-making.  Thus, the 2002 ordinance approval is vacated insofar as it permitted gaming on land to be acquired by the SNI in Erie County, at a location in the City of Buffalo.  Because the "Indian lands" determination is one that Congress squarely placed in the NIGC's hands, the Ordinance is remanded to the NIGC for an "Indian lands" determination and further proceedings consistent with this Decision.

The remand to the NIGC renders Plaintiffs' remaining claims moot and, as discussed above, all motions not expressly decided herein are denied as moot.

## V.  ORDERS

IT HEREBY IS ORDERED, that the Seneca Nation of Indians' Motion for Leave to File an *Amicus* Brief (Docket No. 44) is GRANTED, but its request for Rule 19 Dismissal is DENIED.

FURTHER, that Defendants' Motion to Dismiss (Docket No. 22) is GRANTED in part, and DENIED in part consistent with the foregoing Decision.

FURTHER, that the National Indian Gaming Commission Chairman's administrative decision approving the "Seneca Nation of Indians Class III Gaming Ordinance of 2002 as

Amended" is VACATED and REMANDED insofar as it authorized gaming on what is described herein as the Buffalo Parcel.

FURTHER, that, in light of the remand, Plaintiffs' Motion for Summary Judgment (Docket No. 39) is DENIED as moot.

FURTHER, that Defendants' Motion to Strike exhibits and portions of Plaintiffs' Memorandum in Support of Summary Judgment (Docket No. 54) is DENIED as moot.

FURTHER, that, in light of the remand, the remainder of Plaintiffs' and Intervenor-Plaintiffs' claims are moot and the Complaint and Intervenor-Complaint are Dismissed in their entirety.

FURTHER, that the Clerk of the Court is directed to take the necessary steps to close this case.


        SO ORDERED.

Dated:       January 12, 2007
             Buffalo, New York


                                    /s/William M. Skretny
                                    WILLIAM M. SKRETNY
                                    United States District Judge